1
2
3
4
5
6
7
8

IN THE UNITED STATES DISTRICT COURT

9

FOR THE EASTERN DISTRICT OF CALIFORNIA

10

**JESUS DOMINGO FELISCIAN,**

Case No. **1:12-cv-00067 LJO MJS (HC)**

11

Petitioner,

**FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS**

12
13

**v.**

14
15

**GREG LEWIS, Acting Warden,**

16

Respondent.

17
18

Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus

19

pursuant to 28 U.S.C. § 2254. Petitioner is represented by Rebecca P. Jones.

20

Respondent is represented by Melissa J. Lipton of the office of the California Attorney

21

General. Neither party has consented to Magistrate Judge jurisdiction. (ECF No. 9, 12.)

22

I.      **PROCEDURAL BACKGROUND**

23

Petitioner is currently in the custody of the California Department of Corrections

24

pursuant to a judgment of the Superior Court of California, County of Tulare, following

25

his conviction by jury trial on January 30, 2009, of second degree robbery, attempted

26

second degree robbery, first degree residential robbery, dissuading a witness by force or

27

threat, dissuading a witness, resisting, obstructing, or delaying a peace officer, and

28

various sentencing enhancements. (Clerk's Tr. at 430-32.) On March 26, 2009,

1   Petitioner was sentenced to an indeterminate term of twenty-seven (27) years and four
2   months to life. (Id.)

3        Petitioner filed a direct appeal with the California Court of Appeal, Fifth Appellate
4   District, on November 4, 2009. (Lodged Doc. 7.) The Court modified and reduced
5   Petitioner's sentence by eight months, but otherwise affirmed the judgment of the trial
6   court on June 24, 2010. (Lodged Doc. 11.) Petitioner's petition for review, filed with the
7   California Supreme Court, was summarily denied on October 13, 2010. (Lodged Docs.
8   12-13.)

9        Petitioner proceeded to file collateral appeals of his conviction in state court. On
10  April 15, 2011, Petitioner filed a state petition for writ of habeas corpus in the Tulare
11  County Superior Court. (Lodged Doc. 14.) On April 19, 2011, the Superior Court denied
12  the petition. (Id.) On May 15, 2011, Petitioner filed a state petition with the California
13  Court of Appeal, Fifth Appellate District. (Lodged Doc. 15.) The petition was denied on
14  August 18, 2011. Finally, Petitioner filed a petition with the Supreme Court of California
15  on August 29, 2011. (Lodged Docs. 16-19.) The petition was denied on November 11,
16  2011. (Id.)

17       Petitioner filed his federal habeas petition on January 12, 2012. (Pet., ECF No. 1.)
18  The petition raises two grounds for relief: 1) there was insufficient evidence to support
19  the gang allegation and enhancement; and 2) Petitioner's sentence violates the Eighth
20  Amendment prohibition on cruel and unusual punishment because it is, in effect,
21  sentences a minor to  life without parole for a non-murder offense. (Id.)

22       Respondent filed an answer to the petition on March 23, 2012. (Answer, ECF No.
23  13.) Petitioner filed a traverse on April 18, 2012. (Traverse, ECF No. 15.)

24  **II.    STATEMENT OF THE FACTS**[1]

25       FACTS**[FN2]**

26

---

27  [1] The Fifth District Court of Appeal's summary of the facts in its June 24, 2010 opinion is presumed correct. 28 U.S.C. § 2254(e)(1).

28

**FN2**. Counts 1 and 2 occurred on November 8, 2006, and involved victim J.J. Counts 3 and 4 occurred on April 4, 2007, and involved victim T.A. Counts 5 and 6 occurred on April 5, 2007, and involved victim F.M. Count 7 occurred between April 5 and 27, 2007. Since the contested appellate issues relate solely to the street terrorism allegations attached to counts 1 and 2, the factual summary is limited these crimes and the gang evidence.

During the afternoon of November 8, 2006, J.J. was waiting at a bus stop in Goshen in the area of Camp Road and Elder Avenue. J.J., who was about 15 or 16 years old, was wearing a gray T-shirt with blue sleeves.

Appellant, who was wearing a red shirt and a red belt, approached J.J. J.J. noticed appellant "was wearing a lot of red, that he was in [the north side] gang."

Appellant said to J.J., "You're wearing a lot of blue." He asked J.J. if he "claimed that color." J.J. replied that he "didn't claim," which means that he was not a gang member.

Appellant asked J.J. what he was doing, if he knew what time the bus was supposed to be there and if knew the people who were in a nearby taco truck.

Appellant also asked where J.J. lived. J.J. replied that he "lived in Okie Town, which is another part of Goshen."

Appellant "said that he had … a gun and that he had used it before and he wasn't afraid to use it again." Although J.J. did not see a gun in appellant's possession, he believed appellant was armed.

Appellant asked J.J. "what [he] had in [his] pockets, and [appellant] saw that [J.J.] had a cell phone in one of [his] pockets. [Appellant] asked for the cell phone and the wallet." J.J. gave them to appellant "[b]ecause he said he had a gun" and J.J. was afraid.

Appellant looked through the wallet and asked J.J. "how much money [he ]had in the ATM card." J.J. told appellant that he "had a couple dollars."

After searching through the wallet, appellant gave it back to J.J. Appellant told J.J. that he was going to keep the cell phone.

During the time appellant "was taking [J.J.'s] stuff," one of appellant's friends approached appellant and whispered something to him. The friend left without speaking to J.J.

Appellant told J.J. "not to tell anyone, that he knew where I lived now and he would … come and kill me if I said anything." Then appellant walked away.

When appellant was out of sight, J.J. ran to his grandmother's house where he called the police to report the robbery.

3

Around 2:20 p.m., Tulare County Sheriff's Department Detectives S.S. and R.R. were working in the Goshen area on "gang suppression patrol" in an unmarked police vehicle when they heard a dispatch describing the circumstances of the robbery and a description of the suspects. Ten to 15 minutes later, they encountered and detained appellant in an area north of the bus stop where J.J. was robbed.

Detective S.S. found a cell phone in appellant's pocket and asked appellant where he got it. Appellant replied that "he got it from a kid at the bus stop."

Tulare County Sheriff's Department Deputy J.B. drove J.J. to the location where appellant was being detained. J.J. identified appellant as the person who robbed him and the cell phone as the one that appellant took from him.

Appellant told Deputy J.B. that he borrowed the cell phone from a person who was near a bus stop "in the area of Camp and Elder to make a phone call." In response to the deputy's question why he left the bus stop with the cell phone, appellant said that he forgot the phone number he was going to dial and so he was walking away toward a residence where he could obtain the phone number. Appellant said he did not remember the residence's address. Appellant "claimed it was all voluntary between him and the guy at the bus stop."

J.J. identified appellant as the person who robbed and threatened him at the preliminary hearing and the trial.

After the jury returned its guilty verdicts on the substantive offenses, trial of the gang allegations was held.

Tulare City Police Department Officer J.H. testified as a gang expert. He explained that the Nortenos is a criminal street gang. The Nortenos identify with the color red and the number 14.

The Nortenos have a "very violent" rivalry with the Surenos gang, who identify with the color blue and the number 13.

The primary activities of the Nortenos in November 2006 were vandalism, assaults, murder, witness intimidation, robbery, grand theft, vehicle theft and petty theft. Nortenos members commit theft-related offenses to obtain money to buy drugs and guns.

Officer J.H. testified about numerous predicate offenses committed by Nortenos members, including a car theft appellant committed in 2005.

In November 2006, there were approximately 50 Nortenos in Goshen, about 100 to 150 Nortenos in Visalia and about 50 Nortenos in Cutler. Even though they lived in different towns and belonged to different cliques at the street level, they were all Nortenos.

In the town of Goshen, Nortenos claim the area east of the railroad tracks as their territory and the Surenos claim the area to the west of the tracks as their territory. The location where appellant robbed J.J. was near the dividing line of the two territories, on the Nortenos side of the railroad

4

tracks.

Officer J.H. opined that appellant was a Norteno in November 2006 for the following reasons: (1) appellant admitted that he was a Norteno to police officers on multiple occasions; (2) he identified himself as a Norteno on an Inmate Classification Form; (3) he had several gang monikers; (4) he had gang tattoos; (5) he associated with other documented Nortenos; (6) his brother was a documented Norteno; (7) he was a suspect in a threat case during which he allegedly called the victim a "scrap," which is a derogatory term for Surenos; (8) he was assaulted by a Sureno; (9) in the instant case appellant chose a victim who was wearing the color blue and appellant asked about J.J.'s gang association prior to robbing him.; and (10) appellant advertised his Norteno affiliation by wearing a red shirt and red belt when he robbed J.J.

Officer J.H. opined that J.J. was not a Sureno; he was "[j]ust wearing the wrong color."

A hypothetical was presented to Officer J.H. matching the factual circumstances of the robbery and threat charged in counts 1 and 2 and asked if it "would benefit the Nortenos." Officer J.H. opined that this crime would benefit the Nortenos. J.H. testified that crimes such as these are one of the ways Nortenos control their territory; it is a form of "policing the area." Wearing blue-colored clothing in this area of Goshen is viewed by Nortenos "as a sign of disrespect" and when a Norteno sees a person wearing blue clothing, he "needs to show that he's down for the gang and needs to confront this subject." Crimes like this demonstrate that "you don't wear blue on this side of the tracks" or "bad things happen to you." This benefits the Nortenos by instilling fear in the community. It demonstrates "that this gang member is out there doing it to this person who has nothing to do with gangs." Also, it benefits the Nortenos by "keep[ing] people from coming forward [to report] other crimes."

On cross-examination, Officer J.H. agreed that all robberies instill fear in the community. However, "a subject who's wearing a red shirt, who's known throughout the community as being a Norteno gang member, committing this crime is [going to] instill fear for both that individual as well as the gang."

Officer J.H. also opined that commission of a robbery enhances appellant's status within the Nortenos. "He's gonna be looked at as someone who's willing to commit these crimes. He's gonna be put on a pedestal by these other gang members."

People v. Feliscian, 2010 Cal. App. Unpub. LEXIS 4783, 1-9 (Cal. App. 5th Dist. June 24, 2010)

## II.   DISCUSSION

### A.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. §

2241(c)(3); <u>Williams v. Taylor</u>, 529 U.S. 362, 375 fn.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  In addition, the conviction challenged arises out of the Tulare County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2241(d); 2254(a). Accordingly, the Court has jurisdiction over the action.

### B.   Legal Standard of Review

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  <u>Lindh v. Murphy</u>, 521 U.S. 320, 326 (1997); <u>Jeffries v. Wood</u>, 114 F.3d 1484, 1499 (9th Cir. 1997). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

Under AEDPA, an application for a writ of habeas corpus by a person in custody under a judgment of a state court may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a); <u>Williams v. Taylor</u>, 529 U.S. at 375 n. 7 (2000). Federal habeas corpus relief is available for any claim decided on the merits in state court proceedings if the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

### 1.   Contrary to or an Unreasonable Application of Federal Law

A state court decision is "contrary to" federal law if it "applies a rule that contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from" a Supreme Court case, yet reaches a different result."  <u>Brown v. Payton</u>, 544 U.S. 133, 141 (2005) citing <u>Williams</u>, 529 U.S. at 405-06. "AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied. . . . The statue recognizes . . . that

even a general standard may be applied in an unreasonable manner" Panetti v. Quarterman, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted).  The "clearly established Federal law" requirement "does not demand more than a 'principle' or 'general standard.'" Musladin v. Lamarque, 555 F.3d 830, 839 (2009).  For a state decision to be an unreasonable application of clearly established federal law under § 2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle (or principles) to the issue before the state court.  Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003).  A state court decision will involve an "unreasonable application of" federal law only if it is "objectively unreasonable." Id. at 75-76, quoting Williams, 529 U.S. at 409-10; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002). In Harrington v. Richter, the Court further stresses that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." 131 S. Ct. 770, 785 (2011), (citing Williams, 529 U.S. at 410) (emphasis in original).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 786 (citing Yarborough v. Alvarado, 541 U.S. 653, 664 (2004)). Further, "[t]he more general the rule, the more leeway courts have in reading outcomes in case-by-case determinations." Id.; Renico v. Lett, 130 S. Ct. 1855, 1864 (2010). "It is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." Knowles v. Mirzayance, 129 S. Ct. 1411, 1419 (2009), quoted by Richter, 131 S. Ct. at 786.

## 2.  Review of State Decisions

"Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the claim rest on the same grounds." See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  This is referred to as the "look through" presumption. Id. at 804; Plascencia v. Alameida, 467 F.3d 1190, 1198 (9th Cir. 2006).  Determining whether a state court's decision resulted from an unreasonable legal or factual conclusion, "does not require that there be an opinion from

1    the state court explaining the state court's reasoning." <u>Richter</u>, 131 S. Ct. at 784-85.

2    "Where a state court's decision is unaccompanied by an explanation, the habeas

3    petitioner's burden still must be met by showing there was no reasonable basis for the

4    state court to deny relief." <u>Id.</u> ("This Court now holds and reconfirms that § 2254(d) does

5    not require a state court to give reasons before its decision can be deemed to have been

6    'adjudicated on the merits.'").

7         <u>Richter</u> instructs that whether the state court decision is reasoned and explained,

8    or merely a summary denial, the approach to evaluating unreasonableness under §

9    2254(d) is the same: "Under § 2254(d), a habeas court must determine what arguments

10   or theories supported or, as here, could have supported, the state court's decision; then

11   it must ask whether it is possible fairminded jurists could disagree that those arguments

12   or theories are inconsistent with the holding in a prior decision of this Court." <u>Id.</u> at 786.

13   Thus, "even a strong case for relief does not mean the state court's contrary conclusion

14   was unreasonable." <u>Id.</u> (citing <u>Lockyer v. Andrade</u>, 538 U.S. at 75). AEDPA "preserves

15   authority to issue the writ in cases where there is no possibility fairminded jurists could

16   disagree that the state court's decision conflicts with this Court's precedents." <u>Id.</u> To put

17   it yet another way:

18           As a condition for obtaining habeas corpus relief from a federal
             court, a state prisoner must show that the state court's ruling on the claim
19           being presented in federal court was so lacking in justification that there
             was an error well understood and comprehended in existing law beyond
20           any possibility for fairminded disagreement.

21   <u>Id.</u> at 786-87. The Court then explains the rationale for this rule, i.e., "that state courts

22   are the principal forum for asserting constitutional challenges to state convictions." <u>Id.</u> at

23   787. It follows from this consideration that § 2254(d) "complements the exhaustion

24   requirement and the doctrine of procedural bar to ensure that state proceedings are the

25   central process, not just a preliminary step for later federal habeas proceedings." <u>Id.</u>

26   (citing <u>Wainwright v. Sykes</u>, 433 U.S. 72, 90 (1977).

27           3.   <u>Prejudicial Impact of Constitutional Error</u>

28        The prejudicial impact of any constitutional error is assessed by asking whether

1   the error had "a substantial and injurious effect or influence in determining the jury's

2   verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551

3   U.S. 112, 121-22 (2007) (holding that the Brecht standard applies whether or not the

4   state court recognized the error and reviewed it for harmlessness).  Some constitutional

5   errors, however, do not require that the petitioner demonstrate prejudice.  See Arizona v.

6   Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659

7   (1984).  Furthermore, where a habeas petition governed by AEDPA alleges ineffective

8   assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the

9   Strickland prejudice standard is applied and courts do not engage in a separate analysis

10  applying the Brecht standard.  Avila v. Galaza, 297 F.3d 911, 918, n. 7 (2002).  Musalin

11  v. Lamarque, 555 F.3d at 834.

12  **III.    REVIEW OF PETITION**

13          **A.    Claim One: Insufficient Evidence**

14          Petitioner claims that his due process rights were violated because there was

15  insufficient evidence to support finding the gang allegation enhancements true. (Pet. at

16  5.)

17                  1.    State Court Decision

18          Petitioner presented this claim by way of direct appeal to the California Court of

19  Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the

20  appellate court and summarily denied in subsequent petition for review by the California

21  Supreme Court. (See Lodged Docs. 7-13.) Because the California Supreme Court's

22  opinion is summary in nature, this Court "looks through" that decision and presumes it

23  adopted the reasoning of the California Court of Appeal, the last state court to have

24  issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n.3 (1991)

25  (establishing, on habeas review, "look through" presumption that higher court agrees

26  with lower court's reasoning where former affirms latter without discussion); see also

27  LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000) (holding federal courts look

28  to last reasoned state court opinion in determining whether state court's rejection of

1  petitioner's claims was contrary to or an unreasonable application of federal law under
2  28 U.S.C. § 2254(d)(1)).

3      In denying Petitioner's claim, the California Court of Appeal explained:

4  **I. The gang enhancements are supported by substantial evidence.**

5          **A. The substantial evidence standard of review applies.**

6          When reviewing a challenge to the sufficiency of the evidence, we
7  assess the entire record in the light most favorable to the judgment below
   to determine whether it contains substantial evidence from which a
   reasonable trier of fact could find the defendant guilty beyond a
8  reasonable doubt. (People v. Johnson (1980) 26 Cal.3d 557, 578.) "This
   standard applies to a claim of insufficiency of the evidence to support a
9  gang enhancement." (People v. Vy (2004) 122 Cal.App.4th 1209, 1224.)
   "The standard is the same, regardless of whether the prosecution relies
10 mainly on direct or circumstantial evidence. [Citation.]" (People v. Vazquez
   (2009) 178 Cal.App.4th 347, 352 (Vazquez).)
11

12         In applying the substantial evidence standard of review, the
   appellate court adopts all reasonable inferences and presumes in support
13 of the judgment the existence of every fact that a jury reasonably could
   have deduced from the evidence. Generally, the testimony of a single
14 witness is sufficient to prove a disputed fact. (People v. Young (2005) 34
   Cal.4th 1149, 1181.) The trier of fact makes credibility determinations and
15 resolves factual disputes. An appellate court will not substitute its
   evaluation of a witness's credibility for that of the fact finder. "It is the jury,
16 not this court, that must be convinced beyond a reasonable doubt that the
   gang enhancement allegation is true. [Citation.]" (Vazquez, supra, 178
17 Cal.App.4th at p. 352.)

18         **B. Section 186.22, subdivision (b)(1) did not require the People
   to prove appellant committed counts 1 and 2 with the specific
19 intent to facilitate separate and additional criminal conduct by
   gang members.**

20         In relevant part, section 186.22, subdivision (b)(1), provides for a
   sentence enhancement when a defendant commits a felony "for the
21 benefit of, at the direction of, or in association with any criminal street
   gang, with the specific intent to promote, further, or assist in any criminal
22 conduct by gang members …."

23         In Garcia v. Carey (9th Cir. 2005) 395 F.3d 1099 (Garcia) and
   Briseno v. Scribner (9th Cir. 2009) 555 F.3d 1069 (Briseno), the Ninth
24 Circuit held that the specific intent requirement of section 186.22,
   subdivision (b) requires some evidence be presented supporting an
25 inference that the defendant committed the charged crime with the specific
   intent to facilitate separate and additional criminal conduct by gang
26 members apart from the charged offense. (Garcia, supra, 395 F.3d at p.
   1103; see also Briceno, supra, 555 F.3d at p. 1079.)
27

28         Relying on these Ninth Circuit cases, appellant argues the true
   findings on the gang enhancements must be reversed because the record

10

lacks proof that he committed counts 1 and 2 with the specific intent to facilitate separate and additional criminal conduct by gang members. We disagree. As will be explained, the Ninth Circuit has misinterpreted section 186.22, subdivision (b)(1).

As lower federal court decisions, Garcia and Briseno are not binding on this court. (People v. Hoag (2000) 83 Cal.App.4th 1198, 1205.) No California Court of Appeal has accepted the Ninth Circuit's interpretation of section 186.22, subdivision (b)(1). The appellate courts, which have considered this issue, uniformly agree there is no statutory requirement that the "criminal conduct by gang members" referenced in section 186.22, subdivision (b)(1) must "be distinct from the charged offense, or that the evidence establish specific crimes the defendant intended to assist his fellow gang members in committing." (Vazquez, supra, 178 Cal.App.4th at p. 354; see also People v. Romero (2006) 140 Cal.App.4th 15, 19 (Romero); People v. Hill (2006) 142 Cal.App.4th 770, 774 (Hill).) Vazquez cogently explains:

> "[P] While our Supreme Court has not yet reached this issue, numerous California Courts of Appeal have rejected the Ninth Circuit's reasoning. As our colleagues noted in [Romero, supra, 140 Cal.App.4th at p. 19]: 'By its plain language, the statute requires a showing of specific intent to promote, further, or assist in "*any* criminal conduct by gang members," rather than *other* criminal conduct. (§ 186.22, subd. (b)(1), italics added.)' Thus, if substantial evidence establishes that the defendant is a gang member who intended to commit the charged felony in association with other gang members, the jury may fairly infer that the defendant also intended for his crime to promote, further or assist criminal conduct by those gang members. [Citation.]

> "Like the Romero court, we reject the Ninth Circuit's attempt to write additional requirements into the statute. It provides an enhanced penalty where the defendant specifically intends to 'promote, further, or assist in any criminal conduct by gang members.' (§ 186.22, subd. (b)(1).) There is no statutory requirement that this 'criminal conduct by gang members' be distinct from the charged offense, or that the evidence establish specific crimes the defendant intended to assist his fellow gang members in committing." (Vazquez, supra, 178 Cal.App.4th at pp. 353-354.)

For the reasons expressed in Vazquez, Romero and Hill, we reject the Ninth Circuit's interpretation of section 186.22, subdivision (b)(1), and decline to follow Briseno and Garcia.

**C. The gang expert's opinion that counts 1 and 2 were committed for the benefit of the Nortenos was not speculative or lacking an evidentiary foundation.**

We now consider the sufficiency of evidence proving appellant committed counts 1 and 2 "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members …." (§ 186.22, subd. (b)(1).) Evidence that a crime would enhance a gang's

status or reputation or that it would intimidate rival gangs or potential witnesses within the gang's territory, has been found to be sufficient to support a finding that the crime was "for the benefit of" the gang. (See, e.g., People v. Garcia (2007) 153 Cal.App.4th 1499, 1503-1506, 1511-1512.) This topic is a proper subject for expert testimony. (People v. Zepeda (2001) 87 Cal.App.4th 1183, 1207-1209.) An expert may rely on hearsay in forming his or her opinion. (People v. Catlin (2001) 26 Cal.4th 81, 137.)

It is undisputed that the Nortenos is a criminal street gang and that appellant is a member of this gang. Officer J.H., the gang expert, testified that robbery and witness intimidation were some of the primary criminal activities of Nortenos. Gang members commit theft-related offenses to obtain money to buy drugs and guns. When presented with a hypothetical conforming to the factual circumstances of the substantive offenses, the gang expert opined that the crimes would both benefit the Nortenos and would enhance appellant's status within the gang. He explained that crimes such as these are one of the ways Nortenos control their territory; it is a form of "policing the area." Crimes such as these show the citizenry that "you don't wear blue on this side of the tracks" or "bad things happen to you." This benefits the Nortenos because it instills fear in the area's residents. Also, it makes victims and witnesses less likely to report crimes committed by Nortenos. Appellant's status within the gang is enhanced because he is viewed as a gangster who doesn't allow anyone to disrespect the Nortenos and who commits violent crimes like robbery.

Appellant argues the gang expert's opinion lacked an evidentiary basis and, therefore, was speculative testimony that does not constitute substantial evidence. In appellant's view, the true findings on the gang allegations are essentially based on his gang membership alone. We are not persuaded. As will be explained, the gang expert's opinion was rooted in specific facts related to the crimes (e.g., the location where the crimes were committed, appellant's attire, his choice of victim). Therefore, the challenge to the sufficiency of the evidence fails.

Appellant committed the robbery and made the criminal threat within territory controlled by the Nortenos. The gang expert testified that crimes such as these solidify a gang's control over its territory by instilling fear in the community and decreasing the willingness of residents to report crimes. Appellant points out that the location where he committed the robbery/made the threat is near the border between Nortenos and Surenos territories. This fact does not aid appellant's argument. Borders are often the most fiercely protected portion of a gang's domain because the gang wants to prevent any encroachment by its enemies and consolidate its control over the area.

Appellant was wearing predominately red clothing when he committed these crimes. The gang expert testified that red is a color associated with the Nortenos. The victim testified that he noticed that appellant "was wearing a lot of red, that he was in a [north side] gang." Thus, appellant was advertising his gang status by his clothing. It was not necessary for appellant to verbally announce his gang affiliation to make it apparent to the victim.

Also, appellant chose a teenage boy who was wearing blue clothing as his victim. The gang expert testified that blue is the color associated

1
2
3
4
5

with the Surenos. Before robbing J.J., appellant commented to J.J. that he was wearing blue and asked if he was gang affiliated. It is reasonable to conclude from these facts that the blue sleeves on J.J.'s shirt were significant to appellant and that appellant thought J.J. might have been a Sureno. The gang expert testified that crimes such as these demonstrate to the area's residents that they are not to wear blue clothing or "bad things" will happen to them. This enhances the Nortenos gang's control over the area by even dictating to residents what colors they are allowed to wear. Blue, the color of their enemy, is banned within their territory.

6
7
8
9

Appellant relies heavily on the facts that he was alone when he committed these crimes and did not verbally reference his gang membership. However, appellant was wearing red attire, he was inside Nortenos territory and he chose as his victim a teenage boy who was wearing the color identified with a rival gang. Also, robbery and witness intimidation are two of the Nortenos's primary criminal activities. Therefore, we do not find the absence of fellow gang members or verbal gang references to be determinative.

10
11
12

Appellant's reliance on cases such as People v. Ramon (2009) 175 Cal.App.4th 843 and In re Frank S. (2006) 11 Cal.App.4th 1192 is misplaced. We have examined the many authorities cited by appellant and none of them is factually analogous.

13
14
15
16
17

For all of these reasons, we conclude the gang expert's opinion was not speculative and the record contains ample evidence from which a reasonable jury could find beyond a reasonable doubt that appellant robbed and threatened J.J. for the benefit of, at the direction of, or in association with the Nortenos, with the specific intent to promote, further, or assist in any criminal conduct by gang members. Since appellant was not penalized solely because of his status as a gang member, the gang enhancements did not infringe appellant's federal constitutional rights to due process of law and not to be subjected to cruel and unusual punishment.

18
19

People v. Feliscian, 2010 Cal. App. Unpub. LEXIS 4783, 9-18 (Cal. App. 5th Dist. June 24, 2010).

20

### 2.   Legal Standard - Sufficiency of the Evidence

21
22
23
24
25
26

The Fourteenth Amendment's Due Process Clause guarantees that a criminal defendant may be convicted only by proof beyond a reasonable doubt of every fact necessary to constitute the charged crime. Jackson v. Virginia, 443 U.S. 307, 315-16, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). Under the Jackson standard, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319 (emphasis in original).

27
28

In applying the Jackson standard, the federal court must refer to the substantive

13

1   elements of the criminal offense as defined by state law. <u>Jackson</u>, 443 U.S. at 324 n.16.

2   A federal court sitting in habeas review is "bound to accept a state court's interpretation

3   of state law, except in the highly unusual case in which the interpretation is clearly

4   untenable and amounts to a subterfuge to avoid federal review of a constitutional

5   violation." <u>Butler v. Curry</u>, 528 F.3d 624, 642 (9th Cir. 2008) (quotation omitted).

6        Petitioner asserts that there was insufficient evidence to support finding him guilty

7   of the gang enhancements. To establish a gang enhancement, the prosecution must

8   prove two elements: (1) that the crime was "committed for the benefit of, at the direction

9   of, or in association with any criminal street gang," and (2) that the defendant had "the

10  specific intent to promote, further, or assist in any criminal conduct by gang members

11  ...." Cal. Penal Code § 186.22(b)(1).) "Not every crime committed by gang members is

12  related to a gang." <u>People v. Albillar</u>, 51 Cal.4th 47, 60 (2005). Even "when two or more

13  gang members commit a crime together, they may be on a frolic and detour unrelated to

14  the gang." <u>Emery v. Clark</u>, 643 F.3d 1210, 1214 (9th Cir. 2011) (citing <u>Albillar</u>, 244 P.3d

15  at 1072.)

16       The specific intent element of § 186.22(b)(1) does not "require[ ] that the

17  defendant act with the specific intent to promote, further, or assist a gang; the statute

18  requires only the specific intent to promote, further, or assist criminal conduct by gang

19  members." <u>Albillar</u>, 51 Cal.4th at 67. This element "applies to any criminal conduct,

20  without a further requirement that the conduct be apart from the criminal conduct

21  underlying the offense of conviction sought to be enhanced." <u>Id.</u> at 66; <u>see</u> <u>Emery v.</u>

22  <u>Clark</u>, 643 F.3d at 1215 (recognizing that <u>Albillar</u> "definitively interpreted § 186.22(b)(1),"

23  "overruled" the Ninth Circuit's interpretation of the statute, and that federal courts are

24  bound by the California Supreme Court's interpretation).

25       Evidence that a crime would enhance a gang's status or reputation or that it would

26  intimidate rival gangs or potential witnesses within the gang's territory, has been found to

27  be sufficient to support a finding that the crime was "for the benefit of" the gang. <u>See</u>,

28  <u>e.g.</u>, <u>People v. Garcia</u>, 153 Cal.App.4th 1499, 1503-06 (2007).

1    Petitioner contends that insufficient evidence was shown to support the charged

2    offense because the prosecution did not show that the instant offense was gang related.

3    Instead, he argues that the factual circumstances show that there was no evidence that

4    Petitioner committed the robbery to benefit anyone but himself. As stated above, the

5    California Supreme Court has held that section 186.22(a) does not require a showing

6    that the crime at issue was gang related. See Albillar, 51 Cal. 4th at 66. ("[W]e

7    determined that... statutory language in section 186.22(a), which applies to an active

8    participant in a gang who 'willfully promotes, furthers, or assists in any felonious criminal

9    conduct by members of that gang,' was not ambiguous and extended to any felonious

10   criminal conduct, not just felonious gang-related conduct.")

11   The state court found that the Nortenos is a criminal street gang, and that

12   Petitioner is a member of the gang.  A gang expert testified that a crime such as those

13   committed by Petitioner would both benefit the Nortenos and would enhance Petitioner's

14   status within the gang. Crimes of intimidation would instill fear in the area's residents and

15   make victims and witnesses less likely to report crimes committed by Nortenos. See

16   People v. Feliscian, 2010 Cal. App. Unpub. LEXIS 4783 at 9-18.

17   The Court of Appeal considered Petitioner's challenge to the sufficiency of the

18   evidence for the gang conviction on direct appeal. The court explained the elements of

19   the gang charge under Section 186.22(b) and clearly reviewed the evidence underlying

20   that conviction in the light most favorable to the prosecution. The Court therefore finds

21   that the appellate court analysis was based on the correct federal legal standard and did

22   not unreasonably apply federal law in evaluating Petitioner's sufficiency of the evidence

23   claim.

24   Under Jackson and AEDPA, the state decision is entitled to double deference on

25   habeas review. Based on the Court's independent review of the trial record, it is

26   apparent that Petitioner's challenge to whether the crime was committed in furtherance

27   of the criminal street gang is without merit. There was no constitutional error, and

28   Petitioner is not entitled to relief with regard to this claim.

**B.    Claim Two: Cruel and Unusual Sentence Under Graham v. Florida**

In his second claim, Petitioner asserts that his sentence violates the Eighth Amendment prohibition on cruel and unusual punishment. Specifically, he asserts that his sentence is effectively one of life without the possibility of parole, a sentence prohibited under Graham v. Florida, 560 U.S. 48, 130 S. Ct. 2011; 176 L. Ed. 2d 825 (2010). (Pet. at 7.) Alternatively, Petitioner asserts that his sentence is grossly disproportionate. (Id.)

1.    State Decision

Petitioner presented the claim by way of a petition for writ of habeas corpus filed with the Tulare County Superior Court. (Lodged Doc. 14.) The court denied the claim in a reasoned decision. (Id.) Petitioner then presented the claim to the California Court of Appeal and California Supreme Court. (Lodged Docs. 15-19.) Both courts summarily denied the claim. (Id.) Accordingly, in the last reasoned decision denying Petitioner's claim, the Tulare County Superior Court explained:

> Petitioner was convicted in a bifurcated jury trail [sic] of second degree robbery (Count 1), two counts of dissuading a witness from reporting a crime by force or violence (Counts 2 & 6), attempted second degree robbery (Count 3), dissuading a witness from reporting a crime (Count 4), first degree residential robbery (Count 5) and resisting arrest or evading a peace officer (Count 7). The jury found special allegations that he personally used a deadly weapon during the commission of counts 3 and 5 top [sic] be true. It also found gang enhancement allegations that were attached to counts 1 and 2 to be true. The gang allegations were bifurcated from the substantive offenses and weapon use allegations for trial.

> Petitioner claims the sentence of 27 years to life to be cruel and unusual punishment in light of the fact the petitioner was a minor at the time of the offenses, [sic]

> In addition, petitioner "did not harm anyone" [sic]

> Lastly the petitioner claims the sentence was grossly disproportionate to the petitioner's culpability. Life terms have been held not to be cruel and unusual given the proper circumstance. In the instant case the petitioner committed several acts of extreme violence either actual or threatened. Although the term of 27 years to life is a hard term it still leaves an opportunity for the minor to be released from prison at a relatively young age. It is not the same type of commitment where the courts have held that no chance of parole is may [sic] be cruel and unusual given the proper set of circumstances.

16

1
2
3

> The claim that the minor did no harm is not supported by the evidence. He was convicted or [sic] several felonies which included the use of a gun and gang enhancements. The fact no one was shot or killed is not the test of harm towards a victim.

4
5

> The sentence is not grossly disproportionate to the crimes committed and the petitioner's culpability. Accordingly petitioner's writ is denied.

6

(Lodged Doc. 14.)

7

      2.   <u>Analysis</u>

8

      a.    Life Without The Possibility of Parole

9
10

In <u>Graham v. Florida</u>, the Supreme Court held that the Eighth Amendment prohibits sentencing a minor convicted of a non-homicide offense to life without the possibility of parole ("LWOP"). <u>Graham</u>, 130 S. Ct. 2011 at 2034. In <u>Graham</u>, the petitioner was sentenced to LWOP for an armed burglary he committed when he was 16. The Supreme Court agreed, for the first time extending a categorical ban on a type of punishment in a non-death penalty case. The Court held that the Eighth Amendment requires that States "give defendants like Graham some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." <u>Id.</u> at 2030. In other words, the Eighth Amendment "forbid[s] States from making the judgment at the outset that those offenders never will be fit to reenter society." <u>Id.</u>

11
12
13
14
15
16
17
18
19

    In summary, the Supreme Court explained:

20
21
22

> The [Eighth Amendment to the] Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide. A State need not guarantee the offender eventual release, but if it imposes a sentence of life it must provide him or her with some realistic opportunity to obtain release before the end of that term.

23

<u>Id.</u> at 2034.

24
25

    Furthermore, the Ninth Circuit has recently held that "<u>Graham</u> established a new rule of law that is retroactive on collateral review" under <u>Teague v. Lane</u>, 489 U.S. 288, 310 (1989). <u>See</u> <u>Moore v. Biter</u>, 2013 U.S. App. LEXIS 16321 (9th Cir. Aug. 7, 2013).

26
27
28

    Here, the state court denied the claim and found that as Petitioner was eligible for parole after 27 years, Petitioner has an opportunity to be released at "relatively young

age." To be more exact, the parties agree that Petitioner will be eligible for parole in his forties. (Traverse at 11.) Accordingly, Petitioner will be eligible for parole well within the period of his average life expectancy. Petitioner was not sentenced to life without the possibility of parole, and the safeguards described in <u>Graham</u> do not apply to Petitioner's sentence. <u>Graham</u>, 130 S. Ct. 2011, 2023. ("The instant case concerns only those juvenile offenders sentenced to life without parole solely for a nonhomicide offense.")

Petitioner further argues that because the State of California only grants parole to a small number of inmates each year, that Petitioner's sentence while labeled as life with the possibility of parole is, in essence, a "de facto [life without the possibility of parole] sentence." (Traverse at 12.) The Court is cognizant that California grants parole to a relatively small number of parole-eligible prisoners. However, Petitioner has provided no federal authority for the proposition that California's parole process is the equivalent of denying all parole eligibility. The Supreme Court in Graham explained that "[a] life without parole sentence improperly denies the juvenile offender a chance to demonstrate growth and maturity," and that "[a] State need not guarantee the offender eventual release, but if it imposes a sentence of life it must provide him or her with some realistic opportunity to obtain release before the end of that term." <u>Graham</u>, 130 S. Ct. at 2029, 2034.

A parole suitability hearing is precisely the type of meaningful review that the Supreme Court envisioned when prohibiting life without the possibility of parole sentences for certain juvenile offenders. Under California parole law and regulations, a prisoner is provided the opportunity to be heard, and the parole board makes a determination taking into account the following circumstances that tend to show suitability for release:

> **(d) Circumstances Tending to Show Suitability.** The following circumstances each tend to show that the prisoner is suitable for release. The circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate suitability include:

(1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

(2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or the prisoner has given indications that he understands the nature and magnitude of the offense.

(4) Motivation for Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress had built over a long period of time.

(5) Battered Woman Syndrome. At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.

(6) Lack of Criminal History. The prisoner lacks any significant history of violent crime.

(7) Age. The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release.

15 Cal. Code Reg. § 2281.

Petitioner has not shown that he is subject to a sentence of life without the possibility of parole, or that California's parole process is so inadequate as to make every life sentence the equivalent of a life sentence without the possibility of parole.[1] Petitioner's sentence does not violate the Supreme Court decision in Graham v. Florida, and the state court decision denying the claim was not an unreasonable interpretation of

---

[1] Petitioner, in support of his argument that a life sentence and a life without the possibility of parole sentence in California is the same, notes that only four percent of life prisoners are granted parole. (See Traverse at 12.) Even assuming that rate of parole grants to be accurate, it does not mean that Petitioner will not be given the appropriate process, including the right to be heard and present evidence at a hearing in which the parole board will make an individualized determination of his suitability. Furthermore, it is impossible to know what rate the parole board will grant release several decades from now.

1  Supreme Court law.  Petitioner's claim under <u>Graham</u> therefore must be denied.

2  b.    Disproportionate Sentence

3  The Supreme Court has held, in the context of AEDPA review, that the relevant,

4  clearly established law regarding the Eighth Amendment's proscription against cruel and

5  unusual punishment is a "gross disproportionality" principle, the precise contours of

6  which are unclear and applicable only in the "exceedingly rare" and "extreme" case.

7  <u>Lockyer v. Andrade</u>, 538 U.S. 63, 73-76 (2003) (discussing decisions in <u>Harmelin v.</u>

8  <u>Michigan</u>, 501 U.S. 957 (1991), <u>Solem v. Helm</u>, 463 U.S. 277 (1983), and <u>Rummel v.</u>

9  <u>Estelle</u>, 445 U.S. 263 (1980)); <u>Ewing v. California</u>, 538 U.S. 11, 23 (2003). "Successful

10  challenges to the proportionality of particular sentences will be exceedingly rare." <u>Solem</u>,

11  463 U.S. at 289-90.

12  The Supreme Court has upheld prison sentences challenged as cruel and

13  unusual, and in particular, has approved recidivist punishments similar to or longer than

14  Petitioner's 27 years to life sentence for offenses of equivalent or lesser severity. <u>See</u>

15  <u>Andrade</u>, 538 U.S. at 77 (denying habeas relief on Eighth Amendment disproportionality

16  challenge to Three Strikes sentence of two consecutive terms of 25 years to life for

17  stealing $150.00 in videotapes when petitioner had a lengthy but nonviolent criminal

18  history); <u>Harmelin</u>, 501 U.S. at 1008-09 (mandatory life sentence without parole for first

19  offense of possession of more than 650 grams of cocaine is not so disproportionate as

20  to violate the Eighth Amendment); <u>Hutto v. Davis</u>, 454 U.S. 370, 374-75 (1982) (per

21  curiam) (upholding non-recidivist sentence of two consecutive 25 prison terms for

22  possession of nine ounces of marijuana and distribution of marijuana); <u>cf.</u> <u>Solem</u>, 463

23  U.S. at 280-81 (sentence of life imprisonment without possibility of parole for seventh

24  nonviolent felony violates Eighth Amendment).

25  Generally, so long as the sentence imposed by the state court does not exceed

26  statutory maximums, it will not be considered cruel and unusual punishment under the

27  Eighth Amendment. <u>United States v. McDougherty</u>, 920 F.2d 569, 576 (9th Cir. 1990);

28  <u>United States v. Mejia-Mesa</u>, 153 F.3d 925, 930 (9th Cir. 1998) ("punishment within

1  legislatively mandated guidelines is presumptively valid").

2      Here, Petitioner was sentenced to 27 years to life in prison for seven separate

3  crimes including three counts of robbery, three counts of dissuading a witness (two of

4  which involved threat of force or violence), and resisting arrest. The jury also found that

5  Petitioner was armed with a deadly weapon for two of the robberies and found gang

6  enhancement allegations to be true. Petitioner's sentence was less than that of the

7  defendants in <u>Andrade</u> and <u>Harmelin</u>, and allows for the possibility of parole unlike in

8  <u>Solem</u>. <u>See</u> <u>Andrade</u>, 538 U.S. at 74; <u>Taylor</u>, 460 F.3d at 1098 (eligibility for parole,

9  albeit after 25 years, made California Three Strikes sentence "considerably less severe

10  than the one invalidated in <u>Solem</u>"). Petitioner's sentence was reasonably imposed and

11  his is not "the rare case in which a threshold comparison of the crime committed and the

12  sentence imposed leads to inference of gross disproportionality." <u>Harmelin</u>, 501 U.S. at

13  1005.

14      For all of the above reasons, and in light of controlling jurisprudence, this Court

15  cannot find that Petitioner's sentence is grossly disproportionate to his commitment

16  offense. Thus, the state court's rejection of this claim was not contrary to or an

17  unreasonable application of federal law. Accordingly, Petitioner is not entitled to relief

18  with regard to his claim of cruel and unusual punishment under the Eighth Amendment.

19  **IV.   <u>RECOMMENDATION</u>**

20      Accordingly, it is hereby recommended that the petition for a writ of habeas

21  corpus be DENIED with prejudice.

22      This Findings and Recommendation is submitted to the assigned District Judge,

23  pursuant to the provisions of Title 28 U.S.C. § 636(b)(1). Within thirty (30) days after

24  being served with the Findings and Recommendation, any party may file written

25  objections with the Court and serve a copy on all parties. Such a document should be

26  captioned "Objections to Magistrate Judge's Findings and Recommendation." Any reply

27  to the objections shall be served and filed within fourteen (14) days after service of the

28  objections. The parties are advised that failure to file objections within the specified time

may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

Dated:   September 17, 2013         /s/ *Michael J. Seng*
                                   UNITED STATES MAGISTRATE JUDGE